IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-60681

_____

REGGIE DICKEY, and wife; LOIS DICKEY,

Plaintiffs-Appellants,

versus

BAPTIST MEMORIAL HOSPITAL NORTH MS;
UNITED STATES OF AMERICA, VETERANS ADMINISTRATION,

Defendants,

BAPTIST MEMORIAL HOSPITAL NORTH MS,

Defendant-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Mississippi

_____

July 13, 1998

Before BARKSDALE, BENAVIDES, and DENNIS, Circuit Judges.

BENAVIDES, Circuit Judge:

The appellant, Lois Dickey, appeals the district court's order granting Baptist Memorial Hospital-North Mississippi summary judgment on her state-law negligence claim. For the reasons set forth below, we reverse and remand.

I.

On July 28, 1992, Reggie Dickey went to the emergency room at Baptist Memorial Hospital-North Mississippi ("BMH") in Oxford,

Mississippi, complaining of chest pains. Dr. Lamb, an ER physician employed by BMH, ordered that chest x-rays be taken for an apparent heart problem. Dr. Jordan, a radiologist employed by BMH, interpreted the x-rays as revealing a "questionable mass" in Mr. Dickey's right lung, and a BMH radiology report recommended that a chest CT scan be performed.

Before any additional tests could be performed, however, Mr. Dickey and his family requested that he be transferred to the Veterans' Administration Hospital (the "VA Hospital") in Memphis, Tennessee, for follow-up care. Pursuant to BMH policy, Dr. Lamb then called the VA Hospital and spoke with Dr. Washington, the "officer of the day" at the VA Hospital, to explain Mr. Dickey's condition and to obtain consent to have him transferred.

After obtaining approval for the transfer, BMH transferred Mr. Dickey to the VA Hospital. The ER record from BMH, which was prepared by Dr. Lamb and which accompanied Mr. Dickey to the VA Hospital, noted, inter alia, the following: "chest x-ray, pathology right chest, ? [questionable] mass on right-radiological report," under the "physician history and physical" category. The radiological report to which the ER record refers was available at the time of Mr. Dickey's transfer but was not forwarded to the VA Hospital. The parties dispute whether the x-rays taken at BMH revealing the questionable mass on the right lung were forwarded to the VA Hospital. After the transfer, the VA Hospital undertook all medical care for Mr. Dickey, and BMH had no further involvement.

- 2 -

When Mr. Dickey arrived at the VA Hospital, Dr. Dempsey, the VA Hospital's radiologist, performed another set of chest x-rays to locate the source of Mr. Dickey's chest pain. These x-rays, which used a different film technique than that used by BMH, apparently did not reveal the questionable mass in Mr. Dickey's right lung. Fifteen months later, Mr. Dickey was diagnosed with lung cancer. On February 6, 1996, Mr. Dickey died as a result of the lung cancer.

## II.

On November 6, 1995, Mr. and Mrs. Dickey filed suit against BMH and the United States (the VA Hospital) for negligence arising out of Mr. Dickey's medical care. On March 7, 1996, after her husband's death, Mrs. Dickey filed an amended complaint as the administratrix of the estate and on behalf of herself and all other wrongful death beneficiaries. On April 29, 1996, Mrs. Dickey filed a second amended complaint, in which she claimed that BMH employees negligently failed to send the x-ray report and/or the x-rays to the VA Hospital when Mr. Dickey was transferred. Mrs. Dickey also claimed that BMH's failure to send the x-rays and radiology report constituted a violation of Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd(c)(2)(C), which requires that all x-rays and medical records be sent with a patient when he is transferred. Finally, Mrs. Dickey claimed that the VA Hospital employees were negligent in losing the x-rays in the event that

they were sent to them, in failing to diagnose Mr. Dickey's tumor on the x-rays that were taken at the VA Hospital, and in not reviewing the medical records that were actually received from BMH.

On June 27, 1996, the district court granted BMH's motion for partial summary judgment and dismissed the claim brought pursuant to EMTALA as time barred. On September 10, 1996, the district court granted BMH's motion for summary judgment with respect to Mrs. Dickey's state-law negligence claim. On October 8, 1996, Mrs. Dickey filed an interlocutory appeal with respect to the dismissal of BMH from the action. On November 4, 1996, the district court entered a judgment dismissing the action against the VA Hospital by reason of settlement. On January 27, 1997, this court dismissed Mrs. Dickey's appeal for want of prosecution. By order dated March 19, 1997, however, this court reinstated Mrs. Dickey's appeal against BMH.

On appeal, Mrs. Dickey argues only that the district court erred in granting BMH summary judgment on Mrs. Dickey's state-law negligence claim. Mrs. Dickey has not appealed the district court's order dismissing her EMTALA claim against BMH.

III.

This court reviews the grant of summary judgment de novo, applying the same standards as the district court. See Duffy v. Leading Edge Prods., Inc., 44 F.3d 308, 312 (5th Cir. 1995). Under

Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case.  See id. at 323, 106 S. Ct. at 2553.  In reviewing a motion for summary judgment, the court views the facts and the inferences to be drawn from those facts in the light most favorable to the non-movant.  See Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997).

## IV.

To establish any claim for negligence under Mississippi law, the plaintiff must prove the following elements: 1) the existence of a duty on the part of the defendant to conform to a specific standard of conduct; 2) a breach of that duty; 3) that the breach of duty was the proximate cause of the plaintiff's injury; and 4) that damages to the plaintiff have resulted.  Drummond v. Buckley, 627 So.2d 264, 268 (Miss. 1993); Barner v. Gorman, 605 So.2d 805, 808-09 (Miss. 1992).

## A.

To date, no Mississippi court has specifically addressed the duty of care owed by a transferring hospital to a patient with respect to the transfer of the patient's records. In general, however, physicians in Mississippi have a duty to exercise "'reasonable and ordinary care' in their treatment of patients." Drummond, 627 So.2d at 268. What constitutes "reasonable and ordinary care" in any particular case is often a fact specific question and must ordinarily be established through expert medical testimony. See id.; Travis v. Stewart, 680 So.2d 214, 218 (Miss. 1996) (holding that medical negligence must be established by "medical testimony that the defendant[s] failed to use ordinary skill and care"). Although this usually means that the plaintiff must rely on her own expert testimony, Mississippi law also recognizes that a medical-malpractice plaintiff "may utilize the defendant himself as a source of proof of the standard of care. . . ." Meena v. Wilburn, 603 So.2d 866, 870 n.9 (Miss. 1992) (quotation omitted). A plaintiff may use the defendant's own testimony when "the physician [as defendant testifies] to the standard in such a clear way that the plaintiff has little trouble demonstrating a deviation from that standard." Id. (citation omitted).

In this case, the district court concluded, as does the dissent, that a transferring hospital only has a duty "to communicate all of [the patient's] pertinent medical conditions to the transferee hospital." Slip op. at 12 (emphasis in the

- 6 -

original).  This conclusion was based, in part, on the deposition testimony of Dr. Lamb, the ER physician who treated Mr. Dickey at BMH, who testified that a physician has a duty to "relay all significant information to the receiving doctor."  According to the district court, this duty was satisfied when BMH transferred the ER report, which "clearly put the VA hospital on notice of the questionable mass in Mr. Dickey's right lung."  Id.  In reaching this conclusion, however, the district court failed to take into account the specific steps identified by Dr. Lamb and other BMH hospital personnel in their depositions as necessary to satisfy this duty of care.

In addition to testifying that a physician has a duty to "relay all significant information to the receiving doctor," Dr. Lamb testified that it was BMH's "standard of practice" to forward either the x-rays or copies of the x-rays to the hospital to which a patient is transferred.  He further testified that, although it was not customary to forward the radiology report because of the time lag in its preparation, such a report should be forwarded if available.

Moreover, Nurse Willard, the BMH nurse who accompanied Mr. Dickey during his transfer from BMH to the VA Hospital, testified that her "standard of care" as a nurse required her to take the x-rays and the x-ray report, if it was ready, with her to the VA Hospital.  Finally, Loralei McGee, BMH's Director of Health Information, agreed in her deposition that if the x-rays were not

forwarded, "someone down here at Baptist would have made a mistake."

Given this uncontradicted testimony, we conclude that, at a minimum, a genuine issue of material fact exists as to whether BMH needed to transfer the x-rays and x-ray report to the VA Hospital in order to satisfy its duty to use "reasonable and ordinary care" in its treatment of Mr. Dickey. In reaching this conclusion, we expressly note that we are not concluding that this duty requires as a matter of Mississippi law that a transferring hospital transfer any x-rays and x-ray reports to a transferee hospital. Rather, under Mississippi law, whether BMH's legal duty to use reasonable and ordinary care included the obligation to transfer these records will ultimately be decided by a jury, after hearing expert testimony. See Drummond, 627 So.2d at 268.

B.

"Given a delineation of the specific acts that needed to be performed to adhere to the standard of care, the question of whether a breach of that standard occurred becomes a factual inquiry focusing on whether the physician did the delineated acts." Drummond, 627 So.2d at 269. In this case, there is no dispute that BMH did not forward the x-ray report to the VA Hospital. Consequently, if the jury concludes that BMH's duty to provide reasonable and ordinary care required BMH to forward the x-ray report, then BMH would have breached its duty of care to Mr.

Dickey.

In addition, we conclude that a genuine issue of material fact exists as to whether BMH forwarded Mr. Dickey's x-rays to the VA Hospital. BMH argues that it delivered the x-rays and points to the testimony of ER nurse Willard, who recalled delivering an x-ray envelope to the VA hospital. Willard also completed transmission records which indicate that x-rays were sent to the VA. Willard testified, however, that she did not check to see that Mr. Dickey's x-rays were in the envelope or whether there were any x-rays in the envelope. In addition, BMH does not dispute that the records of another BMH patient were accidently transferred with Mr. Dickey.

In response, Mrs. Dickey argues that a number of pieces of evidence support her position that BMH did not forward the x-rays to the VA Hospital. First, she argues that BMH has no record of making copies of the x-rays prior to the transfer and that its records indicate that Mr. Dickey's x-rays were checked out for the first time over one year after he was transferred to the VA.

Second, she argues that no one at the VA can recall having seen the BMH x-rays and that no record exists indicating that they were received by the VA Hospital. In support of this argument, Mrs. Dickey relies on the deposition testimony of two ER nurses, who stated that there was no record of receipt of any x-rays, which there would have been if received from another hospital.

Third, Mrs. Dickey points to the deposition testimony of Dr. Washington who testified that x-rays would be redone on VA patients

only if the x-rays from the transferor hospital were never received or if they were of poor quality. If x-rays of good quality arrived with a patient, Dr. Washington testified that new x-rays would not be taken on the same part of the body. There is no real dispute that the BMH x-rays were of good quality. Thus, Mrs. Dickey argues, because the VA Hospital took new x-rays of Mr. Dickey's chest upon his arrival at the VA Hospital, a jury could reasonably conclude that BMH did not forward the x-rays to the VA Hospital.

Even BMH concedes that one possible inference to be drawn from the VA Hospital's ordering of chest x-rays is that the VA Hospital did not receive the BMH x-rays. Because all reasonable inferences must be drawn in Mrs. Dickey's favor, we conclude that she has demonstrated that there is a genuine issue of material fact as to whether the BMH x-rays were sent to the VA Hospital. Accordingly, we find that the district court erred in concluding that no issue of material fact existed with respect to whether BMH breached its duty of care.[1]

---

[1] Mrs. Dickey also argues that there is a genuine issue of material fact as to whether Dr. Lamb told Dr. Washington, the VA Hospital's "officer of the day" on the day Mr. Dickey was transferred, about the questionable mass. In his deposition testimony, Dr. Lamb specifically stated that he told Dr. Washington about the questionable mass. Dr. Washington, however, has no present recollection of the conversation, and the VA Hospital's standard form for recording such a "telephonic transfer" has been lost by the VA Hospital. The mere fact that Dr. Washington does not remember the alleged phone conversation, however, is not enough, by itself, to create a genuine issue of material fact. Rule 56 requires that the party opposing summary judgment point to specific evidence that creates a genuine issue of material fact. See Posey v. Skyline Corp., 702 F.2d 102, 105-06 (7th Cir. 1983).

C.

We next address whether there is a genuine issue of material fact as to whether BMH's alleged breach of duty proximately caused Mr. Dickey's injuries. To prove proximate cause, the plaintiff must show some reasonable connection between the defendant's breach and the damage that the plaintiff has suffered. Brunham v. Tabb, 508 So.2d 1072, 1074 (Miss. 1987). To survive summary judgment, the plaintiff must make a showing that "affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." Id. In a medical malpractice case, this means that the plaintiff must produce evidence that "in the absence of the alleged malpractice, a better result was probable, or more likely than not." Drummond, 627 So.2d at 270 (quoting Ladner v. Campbell, 515 So.2d 882, 889 (Miss. 1987)). As above, expert testimony is generally necessary to make such a showing. Palmer v. Anderson Infirmary Benevolent Ass'n, 656 So.2d 790, 795 (Miss. 1995); Drummond, 627 So.2d at 270.

In this case, Mrs. Dickey argues that BMH's failure to forward the x-rays and x-ray report delayed the diagnosis of Mr. Dickey's cancer until it had progressed to an almost untreatable stage. In support of her argument, Mrs. Dickey relies on the deposition testimony of Dr. Dempsey, the radiologist at the VA Hospital. After reviewing Dr. Dempsey's testimony, we agree with Mrs. Dickey that Dr. Dempsey's testimony makes clear that had he seen either the BMH x-rays[2] or the BMH x-ray report,[3] he would have ordered

---

[2] With respect to the failure to forward the x-rays, Dr. Dempsey testified as follows:

Q:    Now, if you had that film available in '92, as well as your films and prior films, what would you have recommended that a clinician do?

MR. DUNBAR: Objection, foundation.

A:    Well, I would have recommended what they recommended, a CT scan and a bronchoscopy.

Q:    So, if you had had available to you the films from Baptist Memorial Hospital from 1992, you would have recommended a CT and bronchoscopy, is that correct?

A:    Yes.

* * *

Q:    How would you describe [the BMH x-rays] if you were dictating a report on that, the one you call more suspicious?

A:    Exactly the way they did: suspicious for neoplasm, and that reaches another threshold that [the VA x-rays] didn't.

R. at 763, 767.

[3] With respect to BMH's failure to forward the x-ray report, Dr. Dempsey testified:

Q:    Have you seen this report from [BMH], x-ray report done by Dr. C. M. Jordan from the July, '92, x-ray?

A:    Yes.

Q:    Do you agree with what he found?

- 12 -

additional tests that probably would have revealed the questionable

mass.  Dr. Dempsey's testimony further creates a genuine issue of

fact regarding whether the questionable mass revealed by the BMH x-

rays developed into the cancer that ultimately caused Mr. Dickey's

death.[4]

---

     A.    Yes.

     Q:    If, in fact, this x-ray report had come along to this hospital with the patient and you had been given this chest x-ray report, would you have also made sure that a CT scan was done?

     A:    Yes.

     MR. DUNBAR: I object to the form.

     Q:    And that would be true, regardless of whether or not you received the actual x-rays from [BMH]? . . .

     A:    Yes.

     Q:    And in your opinion, would the chest CT scan at that time have shown a cancer?

     A:    Probably.

R. at 791-92.

   [4] Dr. Dempsey testified:

     Q:    Now, this one that we call the questionable mass in the 1993 film has been subsumed by the bigger mass, is that correct?

     A:    Right.

     Q:    Does that indicate to you that this questionable mass in 1992 was, in fact, cancer?

     A:    Possibly.

     Q:    More probable than not?

     A:    There is a high probability looking in retrospect, now that we have all of the information.

     Q:    A high probability that this was, in fact, the beginning of the larger cancer over here?

     A:    Right.

In response, BMH contends that Mrs. Dickey has not proven causation because the diagnosis of Mr. Dickey's cancer should have been made based on the ER record notation and the oral communication by Dr. Lamb to Dr. Washington. In other words, BMH argues that the negligence of VA Hospital and its staff was the true cause of Mr. Dickey's delayed diagnosis. It is hornbook law, however, that another party's subsequent negligence does not necessarily sever the chain of causation. Mrs. Dickey had the burden to demonstrate a reasonable basis for the conclusion that it is probable that BMH's breach was a proximate cause, not the sole cause, of the delayed diagnosis of Mr. Dickey's cancer. In this respect, the testimony of Dr. Dempsey clearly establishes that a genuine issue exists as to whether BMH's alleged failure to forward the x-rays and x-ray report proximately caused the delayed diagnosis.[5]

---

Q:   And you would agree that this is one centimeter or less?

A:   Something like that.

Q:   Would you agree that it was probably Stage I at that time?

A:   Right.

R. at 769-70.

Additional information introduced by Mrs. Dickey established the survival rates for lung cancer diagnosed and treated during Stage 1 versus lung cancer diagnosed and treated during Stage 3. BMH did not challenge this testimony before the district court or on appeal.

[5] Moreover, contrary to what BMH implies, Dr. Dempsey testified that, if he had been told only what was in the ER record or what Dr. Lamb told Dr. Washington, he still would not have made the diagnosis or ordered a CT scan:

Q:   If they come with the patient, it is the duty of the emergency room physician of the VA Hospital to read the records to see what the

- 14 -

V.

For the reasons set forth above, the judgment of the district court is REVERSED and this case is REMANDED to the district court for further proceedings not inconsistent with this opinion.

                                        REVERSED; REMANDED.

_____

        man's past history is, is that true?

A:    Right.

Q:    If they had read this records, they would have seen that he had a questionable mass in his right lung, according to the radiologist's findings in Oxford, is that true?

A:    Right.

Q:    And what would you have done at that point if that information had been relayed from the emergency room doctor in Memphis to you?  You would have run an x-ray, wouldn't you?

A:    Right.

Q:    And if that x-ray report was run -- excuse me, if the x-ray series was run and you didn't see anything, then there wouldn't be a CT scan, would there, done here at this hospital?

A:    Well, if I didn't have the films from down there, yes.

Q:    Further -- let's make sure that we are clear on that -- if you had run a chest x-ray here at the VA Hospital in July of 1992 and the results came out just like they did, where you didn't see any evidence of a pulmonary mass, then there would be no CT scan run?

    MR. COCKE:  Are you asking him to ignore the x-rays from [BMH]?

A:    If I had the films from [BMH], the indication for the CT scan was on them.

R.4 at 786-87.

- 15 -

RHESA HAWKINS BARKSDALE, Circuit Judge, dissenting:

Because Baptist Memorial Hospital's (BMH) transfer of the emergency room report, noting the questionable mass in Dickey's right lung, to the VA Hospital, along with BMH's telephone call to the VA Hospital, describing Dickey's condition, including the location of the questionable mass, satisfied BMH's duty to communicate all of Dickey's pertinent medical conditions to the VA Hospital, I respectfully dissent.

BMH's duty of care in this situation, was, as the district court correctly held, "the duty to **communicate** all of [Dickey's] pertinent medical conditions to the transferee hospital". *Dickey v. Baptist Memorial Hospital-North Mississippi*, 1996 WL 672121, *5 (N.D. Miss. 1996). The emergency room report transferred to the VA Hospital *communicated* all of Dickey's pertinent medical conditions, including a questionable mass in the right lung. The report noted: "CxR [chest x-ray] – Pathalogy Rt. Chest ? [questionable] mass in Right–Radiologist's report".

Additionally, as the majority correctly concludes, there is *no genuine issue of material fact* as to whether Dr. Lamb, the treating physician at BMH, told Dr. Washington, the VA Hospital's "officer of the day", about the questionable mass during the telephone call arranging for Dickey's transfer to the VA Hospital.

In his deposition, Dr. Lamb agreed that he would fall below his standard of care if he did not tell the VA physician about the

mass on Dickey's lung. Dr. Lamb testified that, in his conversation with Dr. Washington, he "reviewed the findings in the case, what his presentation was, what we had found including the chest x-ray report. I reviewed the lab work and I told her that [Dickey] requested admission and I felt he was stable for transfer if he wanted to come". And, when asked "did you inform Dr. Washington about the questionable mass on the lung as well as the cardiac situation?", Dr. Lamb replied, "*I did*". (Emphasis added.)

Accordingly, BMH communicated all of Dickey's pertinent medical conditions to the VA Hospital. Therefore, as a matter of law, no breach of duty occurred and the summary judgment for BMH should be affirmed. I respectfully dissent.